**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SMILEDIRECTCLUB, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. _____ |
| | ) |
| CANDID CARE CO., | ) **JURY TRIAL DEMANDED** |
| | ) |
| Defendant. | ) |
| | ) |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff SmileDirectClub, LLC ("Plaintiff" or "SDC"), by and through undersigned counsel, hereby files this Complaint against Defendant Candid Care Co. ("Defendant" or "Candid") for patent infringement. In support hereof, SDC alleges as follows:

**NATURE OF THE ACTION**

1. This is an action for infringement of SDC's U.S. Patent No. 10,636,522 ("the '522 patent"). SDC seeks damages and injunctive relief as provided in 35 U.S.C. §§ 281, 283-285 based on Candid's infringement of the '522 patent.

2. SDC is a pioneer in the doctor-directed remote teledentistry industry, responsible for innovations that have transformed the industry over the last six years.

3. An example of one of its key technological contributions is embodied in the '522 patent. The '522 patent provides methods and systems for patients to receive treatment to reposition one or more teeth using aligner technology in a cost effective and convenient manner, utilizing SDC's revolutionary workflow, including its brick-and-mortar facilities — SDC's SmileShop® locations — and that offer non-clinical, in-person interaction, digital scans, registration, and administrative, non-clinical processing.

4. Candid, in contrast, is a latecomer to this industry and was built using SDC's business model. Indeed, Candid copied SDC's commercially successful and innovative concepts, including the enormously successful SmileShop® business model that SDC innovated and protected with the '522 patent.

5. As it relates to the '522 patent, Candid's accused methods and systems are identical in every meaningful way to those invented by SDC. SDC is informed and believes that Candid knew, even as it built up the brick-and-mortar side of its business, that SDC's patent on these methods and systems was pending (and published). Candid's systems and methods incorporating its brick-and-mortar business are blatant copies that infringe the '522 patent.

6. As a result of this willful infringement, SDC has suffered and will continue to suffer irreparable harm, and Candid has been unjustly enriched as a result of its infringement. SDC brings this action to redress this violation both with equitable relief and money damages.

## THE PARTIES

7. SDC is a Tennessee limited liability company that has its principal place of business at 414 Union Street, 8th Floor, Nashville, Tennessee 37219.

8. On information and belief, Candid is a Delaware corporation with its principal place of business at 33 Union Square West, 11th Floor, New York, New York 10003.

## JURISDICTION AND VENUE

9. This is an action for infringement of a patent arising under 35 U.S.C. § 1 *et seq.* generally and 35 U.S.C. § 271 specifically.

10. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331 and 1338(a).

11. On information and belief, this Court has personal jurisdiction over Candid for at least the following reasons: (1) Candid is incorporated under the laws of the State of Delaware; (2) Candid has purposefully availed itself of the rights and benefits of the laws of the State of Delaware by engaging in systematic and continuous contacts within the State of Delaware; and (3) Candid conducts business in this District and State and has a registered agent located in this District and State.

12. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) because Candid is incorporated under the laws of the State of Delaware and, therefore, "resides" in this judicial district.

## FACTUAL BACKGROUND

### SDC Is A Pioneer In The Teledentistry Industry

13. SDC introduced its teledentistry platform to democratize access to teeth straightening solutions that revolutionized the dental industry. For instance, SDC enabled state-licensed dentists and orthodontists to offer remote direction and management of clear aligner therapy at a fraction of the traditional cost and without necessitating costly, often inaccessible in-person office visits.

14. Prior to SDC's innovative and revolutionary platform, patients had to visit state-licensed dentists or orthodontists in person, on numerous occasions, and during limited office hours, throughout the course of treatment for mild-to-moderate malocclusion (misalignment of the teeth). Not only was this prohibitively expensive for many patients, but the dentist or orthodontist office was often inaccessible to the patient, whether due to location, scheduling issues such as work obligations or school that made repeat visits an impossibility, or other logistical obstacles.

15.     A full 85% of Americans could benefit from orthodontic care, yet because more than 60% (1,972) of all counties in the U.S. do not have an orthodontist's office and the typical price tag for malocclusion correction is $5,000 to $8,000, a mere 1% of these consumers receive the care they need and want each year, with access and cost being the biggest roadblocks.  SDC was born to help bridge that gap.

16.     SDC solved these accessibility and cost problems by developing a teledentistry platform that allows dentists and orthodontists to diagnose, evaluate, and treat patients remotely. SDC's model revolutionized the way that doctors interact with their patients by eliminating the need for the dentist or orthodontist to see the patient in a brick-and-mortar setting and to instead see them remotely using today's technology.  The treatment is more affordable, accessible, and efficient than traditional methods of in-office orthodontic treatment.

17.     As a result, hundreds of millions of consumers worldwide now have access to treatment of mild to moderate malocclusion, or misalignment of the teeth, pending eligibility for clear aligner therapy using a teledentistry platform, as determined by the state-licensed doctors affiliated with SDC.

18.     To date, dentists and orthodontists using SDC's non-clinical administrative support services and its teledentistry platform have treated more than one million patients.

19.     SDC, as a part of its teledentistry platform, launched the revolutionary direct-to-consumer SmileShop® model for orthodontic clear aligners by providing non-clinical, administrative services at its numerous SmileShop® locations.  The SmileShop® model is an additional part of SDC's teledentistry platform that allows SDC to remotely connect patients with its network of roughly 240 affiliated state-licensed treating dentists and orthodontists (collectively, "Doctors"). These Doctors then provide affordable care to populations underserved by traditional

dentists and orthodontists operating in traditional offices. By leveraging SDC's proprietary, cutting-edge technology, and providing non-clinical administrative services through the SmileShop®, including its teledentistry platform, the treating Doctors are able to provide care to patients who could not otherwise afford or have access to clear aligner therapy.

20. A consumer can start their clear aligner therapy journey using SDC's patented platform by requesting an appointment with, and visiting, one of SDC's brick-and-mortar SmileShop® locations throughout the United States. This is by far the most popular SDC customer journey, with the vast majority of SDC's business leads generated through its pioneering SmileShop® model.

21. To book an initial SmileShop® appointment, the consumer visits SDC's website and requests an appointment at a SmileShop® via SDC's online appointment management system. The appointment management system receives the appointment request, schedules an appointment, and then generates and communicates to the consumer confirmation for the upcoming SmileShop® appointment.

22. During the SmileShop® appointment, consumers interface with a non-dentist or orthodontist SDC technician rather than a traditional appointment with the Doctor who will ultimately be treating them. Consumers receive information and education on clear aligners using a teledentistry platform, have traditional and sophisticated photographs of their teeth and gums taken with the sophisticated photographs being taken using a highly-sophisticated intraoral scanner, and the resulting photographs being transformed into a 3-dimensional image. Consumers are subsequently shown visualizations of how clear aligner therapy can change their own smiles. Consumers are also able to complete their dental and health histories, identify their chief concerns

about their smiles, and execute their informed consent. At the SmileShop®, SDC also provides consumers with information about SDC's fixed price for the aligners and about financing options.

23. Next, the digital 3-dimensional images created from the photos taken at the SmileShop® appointment are sent to highly trained lab technicians at a dental lab, working under the direct supervision of more than 60 dentists and orthodontists, to create a draft treatment plan using sophisticated and propriety treatment set-up software. The draft plan is then transmitted electronically to one of SDC's network of Doctors licensed in the consumer's home state. The Doctor reviews the consumer's information and the draft treatment plan and determines whether additional information or clearances are needed from the consumer. If not, or once the Doctor obtains that information, the Doctor approves, rejects, or modifies the draft treatment plan as the Doctor determines appropriate based on her knowledge, training, and expertise. If the Doctor ultimately approves a treatment plan containing a potential course of custom-made clear aligners, the plan is transmitted to the consumer for review.

24. If the consumer elects to move forward with the treatment, the Doctor submits the prescription for manufacture of the aligners. SDC then helps fulfill the prescription by arranging for manufacture of the aligners from an FDA-approved and certified manufacturing facility and sending the aligners directly from the manufacturing site to the consumer. The consumer and his or her treating Doctor control all meaningful decisions, while SDC handles the logistics of their interactions. In other words, the consumer is the Doctor's patient, and the Doctor alone directs treatment and makes medical and clinical decisions for the patient, but without actually seeing the patient in person. SDC, on the other hand, provides the front- and back-office operations for the Doctor, which enables her to focus on her patient's treatment. During this entire process, the consumer does not physically see the Doctor.

**The '522 Patent**

25.     SDC values its innovations in this technology, which give it a significant advantage over its competitors in the brand-new industry of teledentistry. As such, SDC maintains an active patent protection program to safeguard these innovations and to prevent others from improperly capitalizing on SDC's efforts.

26.     SDC's patent portfolio includes the '522 patent, entitled "Arrangements for Intraoral Scanning." The '522 patent was duly and legally issued on April 28, 2020, after a full and fair examination by the United States Patent and Trademark Office. SDC is the assignee and lawful owner of all right, title, and interest to the '522 patent. A true and correct copy of the '522 patent is attached hereto as Exhibit A.

**SDC's Patented Technology Has Been A Commercial Success**

27.     As the innovator in the direct-to-consumer clear aligner therapy market, SDC is currently the dominant player in the industry.

28.     SDC's patented technology, delivered through its SmileShop® locations, is a key driver in expanding access to care and thereby driving SDC's revenue.

29.     In addition, the patented technology remains instrumental in delivering an exceptional customer experience. SDC's average net promoter score of 51 since inception, compared to an average net promoter score of 1 for the entire dental industry (according to West Monroe Partners), and SDC's average rating of 4.55 out of 5 from over 182,000 customer reviews on its website, demonstrate that its customers are highly satisfied with SDC's teledentistry services. Indeed, more than 95% of SDC members surveyed would recommend the SmileShop® experience to friends.

**Candid Directly Competes With SDC**

30. Candid is a competitor as to SDC's dental support organization services that also offers a teledentistry platform. On information and belief, Candid was launched specifically to compete with SDC, and it has repeatedly resorted to unfair and unlawful activities in an attempt to dilute SDC's market share.

31. Two years after the launch of the SmileShop® concept and after seeing that SDC was rapidly expanding with SmileShop® locations around the country, around May 2018, Candid introduced its own brick-and-mortar stores, referred to as "Candid Studios." Candid Studios and the work-flow around Candid's teledentistry services are functionally identical to those of SDC's. As such, Candid has taken advantage of the extensive analysis, financial investment, and effort that SDC invested in developing its workflows and making them as helpful and effective as possible as the consumer considers the decision to improve his or her smile through clear aligners.

32. These shortcuts have given Candid an unfair advantage in developing its copycat shops, and virtually all its strengths as an emerging competitor come from the ways it is copying SDC.

**Candid Copied SDC's Patented Technology**

33. In a further effort to take advantage of the market segment created by SDC, Candid employs a virtually identical teledentistry service to the one invented by SDC and subject of the '522 patent.

34. Candid has continued its commercial efforts notwithstanding its knowledge of SDC's intellectual property and SDC's successful efforts to secure patent protection.

35. The application that matured into the '522 patent was filed on September 13, 2018, and claims priority to an application filed on June 21, 2017. The application was first published

and publicly available on January 10, 2019.[1] On information and belief, Candid knew about SDC's application upon publication because Candid regularly monitors SDC's patent publications and related patent prosecution activities. Therefore, on information and belief, Candid was fully aware that SDC sought patent protection in the inventions disclosed and claimed in the '522 patent since at least January 2019.

36. On information and belief, Candid was further aware that the United States Patent and Trademark office issued a Notice of Allowance indicating that the claimed methods and systems are patentable on March 18, 2020, and an Issue Notification on April 8, 2020.

**Candid Infringes The '522 Patent**

37. In keeping with the knockoff nature of Candid's business model generally, and consistent with their origins in the diversion of SDC intellectual property, the Candid Studios and their workflow are carbon copies of the systems and methods claimed by the '522 patent and currently practiced by SDC.

38. Claim 1 of the '522 patent recites:

A method of producing aligners for repositioning one or more teeth of a user, the method comprising:

receiving, by an appointment management system, a request to schedule an appointment at an intraoral scanning site, the intraoral scanning site having an intraoral scanner configured to scan a mouth of a user, the appointment being for a technician to conduct an intraoral scan of the mouth of the user at the intraoral scanning site without a dentist or orthodontist physically seeing the user during the scheduled appointment, wherein the technician is not a dentist or an orthodontist;

scheduling, by the appointment management system, the appointment at the intraoral scanning site in accordance with the request;

generating and communicating, by the appointment management system, a message to a device of the user, the message including a confirmation confirming the scheduled appointment;

---

[1] Ex. A at cover sheet.

conducting, using the intraoral scanner, the intraoral scan at the intraoral scanning site during the scheduled appointment, the intraoral scan generating three-dimensional data of the mouth of the user;

causing generation, by a treatment plan computing system located at a treatment plan site, of a treatment plan for the user based on the three-dimensional data of the mouth of the user;

receiving an indication of an approval of the treatment plan by a dental or orthodontic professional, wherein the approval is received without the dental or orthodontic professional having physically seen the user;

producing, at a fabrication site, a plurality of aligners based on the treatment plan, the plurality of aligners specific to the user and being configured to reposition one or more teeth of the user in accordance with the treatment plan; and

sending the plurality of aligners from the fabrication site directly to the user, wherein the user receives orthodontic treatment without ever having physically seen the approving dental or orthodontic professional.

39. On information and belief, Candid receives, by an appointment management system, a request to schedule an appointment for an intraoral scan at a Candid Studio location. Candid's website explains that an appointment at a Candid Studio location may be made by visiting Candid's website at candidco.com/studios, scrolling down to the list of locations, and clicking the "Book Now" link on the location that the user would like to visit.[2]

40. Candid Studio locations use intraoral scanners configured to scan the mouths of customers. Candid's website explains that "[t]he process starts with a 3D scan of your teeth at a Candid Studio location."[3] The website further states that Candid's intraoral scanner "takes thousands of pictures every second, which are then meshed together into a high-definition 3D image that serves as a replica of your mouth."[4] Candid Studios use iTero® scanners, the same type of intraoral scanners disclosed in the '522 patent and used in SmileShop® locations.

---

[2] *See* https://www.candidco.com/faq/q/how-do-i-make-an-appointment, last visited April 27, 2020.
[3] https://www.candidco.com/faq/q/how-is-my-treatment-plan-made, last visited April 27, 2020.
[4] https://www.candidco.com/faq/q/how-does-a-scan-work, last visited April 27, 2020.

41. The intraoral scan is performed by a technician who is not a dentist or orthodontist. Candid's website explains that there is not an orthodontist on site at Candid Studio locations and that "you won't see your orthodontist in person."[5] Rather, the intraoral scans are performed by "care specialists" who are "experts on the photo and 3D scan process."[6]

42. On information and belief, Candid's appointment management system schedules appointments at Candid Studio locations.[7]

43. On information and belief, Candid's appointment management system generates and communicates messages to customers confirming the scheduled appointment.[8]

44. During the user's scheduled appointment, a Candid "care specialist" conducts an intraoral scan of the user's mouth using an intraoral scanner which generates three-dimensional data of the mouth of the user. Candid's website explains that the intraoral scanner "takes thousands of pictures every second, which are then meshed together into a high-definition 3D image that serves as a replica of your mouth."[9]

45. After the intraoral scan takes place at the Candid Studio, a treatment plan is generated for the user based on the three-dimensional data of the mouth of the user gathered in connection with the intraoral scans. Candid's website explains that "[a]fter your studio visit, your diagnostic records (the 3D scan, 8 intraoral and extraoral photos, and a dental and medical history questionnaire) are submitted to a state-licensed orthodontist in our network. Once they've reviewed your records and approved you for treatment, your treatment plan will be designed."[10]

---

[5] https://www.candidco.com/faq/q/orthodontist-on-site-at-studio, last visited April 27, 2020.
[6] Id.
[7] See https://www.candidco.com/faq/q/how-do-i-make-an-appointment, last visited April 27, 2020.
[8] Id.
[9] https://www.candidco.com/faq/q/how-does-a-scan-work, last visited April 27, 2020.
[10] https://www.candidco.com/faq/q/how-is-my-treatment-plan-made, last visited April 27, 2020.

On information and belief, the treatment plan is generated by a treatment plan computing system located at a treatment plan site.

46. Thereafter, the user's treatment plan is approved by an orthodontic professional who has never seen the user in person. Candid's website explains that the user "won't see your orthodontist in person,"[11] but that "after your studio visit, an experienced orthodontist in our network will design and engineer your individualized treatment plan."[12]

47. Candid's aligners are produced at a fabrication site based on the individual user's treatment plan and then sent to the user. Candid's website describes that "[o]nce you approve your treatment plan, your aligners will be custom-fabricated and shipped to you within three weeks."[13]

48. The aligners are specific to the user and are configured to reposition one or more teeth of the user in accordance with the treatment plan. The Candid website explains "[a]ligners work by using carefully calibrated force to move your teeth into a new position, forcing the body to adapt by remodeling the bone. Each set of aligners is a unique 3D-printed model of the teeth designed to move them into different positions along the way to the desired end result."[14] The website further explains that "[t]he individualized treatment plan your orthodontist prescribes will harness these biomechanical processes to straighten your teeth gently and gradually. Each step — that is, each new set of aligners — will move them only in small, conservative increments. Eventually your teeth will have moved fully into place, and the active phase of treatment will be complete."[15]

---

[11] https://www.candidco.com/faq/q/orthodontist-on-site-at-studio, last visited April 27, 2020.
[12] https://www.candidco.com/faq/q/will-i-see-a-model-of-my-teeth, last visited April 27, 2020.
[13] https://www.candidco.com/faq/q/when-do-i-get-aligners, last visited April 27, 2020.
[14] https://www.candidco.com/faq/q/how-do-aligners-work, last visited April 27, 2020.
[15] *Id.*

49.     On information and belief, the aligners are sent from the fabrication site directly to the user without the user ever having physically seen the orthodontist that approved the treatment plan. Candid's website describes that "[o]nce you approve your treatment plan, your aligners will be custom-fabricated and shipped to you within three weeks."[16] Further, Candid's website explains that there is not an orthodontist on site at Candid Studio locations and that "you won't see your orthodontist in person."[17]

50.     Therefore, Candid at least directly infringes claim 1 of the '522 patent in violation of 35 U.S.C. § 271.

51.     Claim 13 of the '522 patent recites:

A method comprising:

   requesting, via a web portal or mobile application, an appointment at an intraoral scanning site having an intraoral scanner configured to conduct an intraoral scan of a mouth of a user, the appointment being for a technician to conduct the intraoral scan of the mouth of the user at the intraoral scanning site without a dentist or orthodontist physically seeing the user during the scheduled appointment, wherein the technician is not a dentist or orthodontist;

   receiving, from an appointment management system, a confirmation message confirming a scheduling of the appointment;

   receiving the intraoral scan at the intraoral scanning site during the scheduled appointment, the intraoral scanner generating three-dimensional data of the mouth of the user; and

   receiving, directly from a fabrication site without visiting an office of a dental or orthodontic professional, a plurality of aligners produced in accordance with a treatment plan generated by a treatment plan computing system based on the three-dimensional data of the mouth of the user and approved by the dental or orthodontic professional without the dental or orthodontic professional having physically seen the user;

   wherein the fabrication site produces the plurality of aligners based on the treatment plan;

---

[16] https://www.candidco.com/faq/q/when-do-i-get-aligners, last visited April 27, 2020.
[17] https://www.candidco.com/faq/q/orthodontist-on-site-at-studio, last visited April 27, 2020.

    wherein the plurality of aligners are specific to the user and configured to be administered in a predetermined sequence to reposition one or more teeth of the user in accordance with the treatment plan; and

    wherein the user receives orthodontic treatment without ever having physically seen the approving dental or orthodontic professional.

52. On information and belief, Candid knows or should have known of the '522 patent.

53. On information and belief, Candid provides instructions to users regarding how to perform each of the steps set forth in claim 13 in the manner described above. Through the direction of Candid, users perform, or cause the performance of, each step of claim 13 of the '522 patent. On information and belief, Candid knows or should have known that doing so would infringe at least claim 13 of the '522 patent.

54. Therefore, Candid at least indirectly infringes claim 13 of the '522 patent in violation of 35 U.S.C. § 271(b) by inducing users to directly infringe at least claim 13 of the '522 patent.

### **SDC Is Suffering Irreparable Harm As A Result Of Candid's Infringement**

55. Candid leveraged SDC's innovative technology to gain a foothold in this direct-to-consumer clear aligner industry, a nascent, developing market. Candid's market share in this industry has grown since it first introduced its infringing platform through its Candid Studios and copying of the methods and systems claimed by the '522 patent. The patented systems and methods are effective and are key to the harm that Candid is inflicting on SDC.

56. On information and belief, since its introduction of the infringing platform in May 2018, Candid's market share increased exponentially.

57. SDC and Candid are the only two competitors in the market that offer an option to visit a brick-and-mortar location for an intraoral scan to start the clear aligner process. Candid's

market share increase is due to its infringement of the '522 patent and is at the direct expense of SDC's market share.

58. This diversion of patients comes at a critical juncture in the market's development. Should Candid's willful infringement of the '522 patent continue unabated, Candid will continue to steal market share from SDC in this not-yet-mature industry. That is market share that SDC will not have the same opportunity to capture once the market matures.

59. In the nascent, two-competitor environment, Candid's willful infringement is causing and will continue to cause SDC other forms of irreparable harm such as reputational damage (as the innovator in the field) and loss of goodwill.

60. Indeed, Candid presents itself as a thought leader in this emerging industry, even though it slavishly followed SDC's insights every step of the way. Candid's website claims that the concept of teledentistry was its founders' idea, even though it was not:

> Once upon a time, five of us started talking about our teeth. We all wished they were straighter, but like millions of other people, we didn't want to pay over $5,000 for treatment. … We looked into the aligner industry, and we knew we could make a difference. So we partnered with a world-class orthodontist, Dr. C. Lynn Hurst, and founded Candid.[18]

The true "difference," of course, is SDC's innovation and groundbreaking work to bring teledentistry with clear aligners into the national consciousness.

61. When it comes to the patented technology, Candid is (despite its name) no more forthright with the public. It claims to consumers and investors that its "diagnostic process" was "developed by top-tier orthodontists," implying that Candid oversaw that process — but almost all the key elements of that process and the consumer communication that goes with it were in fact developed at and by SDC, deferring to the diagnostic skills of dental professionals. Crucial

---

[18] https://www.candidco.com/about, last visited April 27, 2020.

components of the consumer experience that Candid calls a "diagnostic process" are claimed by the '522 patent, yet Candid proclaims falsely that it "developed" them itself. In another place, Candid claims that its experience is "simpler than ever,"[19] even though all the elements that make it simple and straightforward for the consumer have been cribbed from SDC.

62. Candid's willful infringement is also causing, and will continue to cause, irreparable harm in the loss of SDC business opportunities. For example, over 20% of SDC's customers today come through referrals from satisfied customers. Thus, for every customer SDC loses to Candid, SDC also loses incalculable and untraceable potential opportunities for new customers. With this cascading effect of patient referrals, the magnitude of the loss of potential customers is not quantifiable.

63. On information and belief, Candid further runs the risk of insolvency in the future and may not be able to satisfy a monetary judgment for willful infringement of the '522 patent by the time this matter reaches trial. On information and belief, Candid has neither strong capitalization nor a sustainable level of cash flow (even before the pandemic).

64. Indeed, on information and belief, Candid's inexperience and the structure of its supply relationships impose high costs that make its business much more difficult to run profitably than SDC's business and which result in Candid's prices being higher than SDC's. Moreover, SDC is concerned that a business as small as Candid will not be able to sustain the impact of the COVID-19 pandemic's disruption to the market. It is unlikely that Candid will have profits to allow it pay any significant damages award by the time this action is concluded.

65. In any event, because the early stage in the development of the industry and the reputational value SDC has built as an innovator and leader in its business, the irreparable harm

---

[19] https://www.candidco.com/how-it-works, last visited April 27, 2020.

caused to SDC by Candid's willful infringement of the '522 patent is not quantifiable. SDC is being forced to compete against its own invention, in a two-player market where perceptions of teledentistry and its leading brands are just being formed.

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 10,636,522

66. SDC incorporates by reference paragraphs 1 through 65 as though fully set forth herein.

67. The '522 patent is valid and enforceable.

68. SDC has complied with the applicable requirements of 35 U.S.C. § 287 with respect to the '522 patent.

69. Candid makes, uses, sells, and/or offers for sale methods and systems that directly infringe, either literally or under the doctrine of equivalents, one or more claims of the '522 patent, including independent claims 1, 13, 20, and 24, and various dependent claims in violation of 35 U.S.C. § 271(a).

70. Candid induces others to infringe, either literally or under the doctrine of equivalents, one or more claims of the '522 patent, including independent claims 1, 13, 20, and 24, and various dependent claims in violation of 35 U.S.C. § 271(b).

71. Candid's infringement of the '522 patent is and has been willful, wanton, egregious, and with utter disregard of SDC's patent rights and will continue unabated unless enjoined by this Court.

72. As a result of Candid's unlawful infringement of the '522 patent, SDC has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law unless the Court enjoins Candid's infringement.

73. SDC has also suffered and will continue to suffer monetary damages due to Candid's unlawful infringement of the '522 patent. SDC is entitled to recover from Candid the damages it suffered as a result of Candid's unlawful acts.

74. On information and belief, Candid's infringement is deliberate and willful. Therefore, SDC is entitled to enhanced damages, including treble damages, under 35 U.S.C. § 284.

## JURY DEMAND

75. In accordance with Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38.1, SDC demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, SDC respectfully prays for the following relief against Candid:

A. A preliminary injunction enjoining Candid from making, using, selling, or offering to sell methods or systems that infringe the '522 patent;

B. A judgment declaring that Candid has infringed and is infringing the '522 patent;

C. A judgment declaring that Candid's infringement of the '522 patent is and has been willful and deliberate;

D. An award of all damages adequate to compensate SDC for Candid's infringement of the '522 patent, and, in no event, less than a reasonable royalty, such damages to be determined by a jury, and, if necessary, an accounting to adequately compensate SDC for the infringement;

E. An award of treble damages under 35 U.S.C. § 284 as a result of Candid's willful and deliberate infringement of the '522 patent;

F. An order finding that this is an exceptional case and awarding SDC its reasonable attorneys' fees, costs, and expenses, as provided by 35 U.S.C. § 285 and/or Rule 54(d) of the Federal Rules of Civil Procedure;

G. An award of pre-judgment interest and post-judgment interest at the maximum rates allowed by law;

H. A permanent injunction, pursuant to 35 U.S.C. § 283, to prevent Candid, and its affiliates, subsidiaries, assigns, employees, agents or anyone acting in privity or concert with Candid from further infringing the '522 patent; and

I. Any and all such other relief that the Court may deem just and proper under these circumstances.

Dated: April 29, 2020

Respectfully submitted,

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

*/s/ Kevin M. Capuzzi*
Kevin M. Capuzzi (Delaware Bar No. 5462)
Noelle B. Torrice (Delaware Bar No. 5957)
222 Delaware Avenue, Suite 801
Wilmington, DE 19801-1611
Telephone: 302.442.7010
Fascimile:  302.442.7012
Email: kcapuzzi@beneschlaw.com
Email: ntorrice@beneschlaw.com

Manish K. Mehta (*pro hac vice forthcoming*)
Kal K. Shah (*pro hac vice forthcoming*)
Suzanne M. Alton de Eraso (*pro hac vice forthcoming*)
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone:  312.212.4949
Facsimile:   312.757.9192
Email: kshah@beneschlaw.com
Email: mmehta@beneschlaw.com
Email: saltondeeraso@beneschlaw.com

Michael S. Weinstein (*pro hac vice forthcoming)*
200 Public Square, Suite 2300
Cleveland, OH 44114
Telephone: 216.363.4500
Facsimile:  216.363.4588
Email: mweinstein@beneschlaw.com

*Attorneys for Plaintiff SmileDirectClub, LLC*