**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

SMILEDIRECTCLUB, LLC,

          Plaintiff,

    v.

CANDID CARE CO.,

          Defendant.

Civil Action No. 1:20-cv-00583-UNA

**DECLARATION OF
DEFOREST MCDUFF, PH.D.**

**PUBLIC VERSION
DATED:  November 3, 2020**

I, DeForest McDuff, Ph.D., declare as follows:

1.    I am an economist and a co-founder of Insight Economics, an economic consulting firm with a focus on business economics and intellectual property, among other areas.  I provide expert witness testimony and consulting in a variety of areas, including economic harm, intellectual property, damages, competition, finance, valuation, and business strategy.  I have been engaged by Benesch, Friedlander, Coplan & Aronoff LLP ("Counsel"), counsel for SmileDirectClub, LLC ("Plaintiff" or "SDC"), to serve as an economic expert in this action.  If called to testify at a hearing or trial, I could and would testify to the following information and opinions.

## I.  Introduction

## A. Qualifications

2.    I am a Partner at Insight Economics and an expert in applied business economics, with more than ten years of experience in consulting, finance, and economic research.  I provide expert witness testimony and consulting in a variety of areas, including lost profits, reasonable royalties, unjust enrichment, commercial success, irreparable harm, balance of hardships, public interest, finance, statistics, valuation, and business analysis.

3.    My experience has included a variety of topics, including intellectual property, business, antitrust, competition, finance, labor, employment, and class action. My work spans the life sciences (*e.g.*, pharmaceuticals, biotechnology, diagnostics, and medical devices), electronics (*e.g.*, consumer electronics, semiconductors, computers, and telecommunications), and has included projects on a diverse range of other industries.  I have significant experience evaluating the economics of medical devices and related products, including evaluations of economic damages, competition, commercial success, irreparable harm, and other issues.

1

4.     I earned my Ph.D. in economics from Princeton University.   At Princeton, I received a National Science Foundation Graduate Research Fellowship for academic research studying financial economics and applied microeconomics.  I have published research in several peer-reviewed academic journals and widely read industry publications.  I graduated *summa cum laude* with undergraduate degrees in economics and mathematics from the University of Maryland.   I am currently appointed and serve as an Adjunct Teaching Faculty in the Department of Economics at the University of North Carolina at Chapel Hill.

5.     My curriculum vitae, provided as Attachment A-1, contains more details on my background, education, experience, and expert testimony.

## B. Scope of work

6.     For this declaration, I was asked to evaluate whether SDC will suffer irreparable harm, from an economic perspective, as a result of the alleged infringement by Candid Care Co. ("Candid") of SDC's U.S. Patent No. 10,636,522 (the "'522 Patent").  I was also asked to evaluate the balance of hardships and the public interest, from an economic perspective.  In performing my evaluation, I have considered discussions with SDC personnel and have performed my own economic research and analysis.  A list of materials considered or relied upon for the purpose of this declaration is provided in Attachment A-2.

7.     In connection with my work on this matter, Insight Economics has been retained by Counsel on behalf of SDC.  Insight Economics is being compensated at a rate of $700 per hour for my work and at lower rates for time spent by others on my team.  The compensation of Insight Economics does not depend on the substance of my testimony or the outcome of this matter.

## C. Summary of opinions

8.     In summary, based on all the facts and information described herein, I

find that, from an economic perspective: (1) SDC has suffered and will continue to suffer irreparable harm as a result of Candid's alleged infringement of the '522 Patent, and available monetary remedies may be inadequate to compensate SDC for such harm (Section III); (2) the balance of hardships favors granting SDC injunctive relief (Section IV); and (3) the public interest favors granting SDC injunctive relief (Section V).  These opinions are discussed in detail below.

## II. Background

## A. Parties

### i. SDC

9.      Founded in 2014, SDC is an oral care company with a medtech platform that uses teledentistry technology to enable state licensed dentists and orthodontists to treat their patients with clear aligner therapy without the need to see their patient in person.[1]  SDC offers dental support organization ("DSO") services, including marketing, logistical, financial, and other non-clinical and administrative services, to a select network of professional corporations and the state-licensed dentists and orthodontists that they employ or otherwise engage, which in turn helps make the purchase of and treatment with clear aligner therapy more convenient and less expensive for customers.[2]  SDC's technology allows dentists and orthodontists to offer remote assessment, diagnosis, prescription, direction and management of clear aligner therapy.[3]  This approach has already enabled treatment for more than 1,000,000 customers in the United States, Puerto Rico, and numerous foreign countries.[4]  I have been informed that SDC's treatment model involves the following steps: (1) customers complete their dental and health histories, identify their chief

---

[1]      Declaration of Jessica Cicurel, at ¶ 3.
[2]      Declaration of Jessica Cicurel, at ¶ 3.
[3]      Declaration of Jessica Cicurel, at ¶ 3.
[4]      SmileDirectClub, Inc., Form 10-K, 2019, at 3.

concerns about their smiles, execute their informed consent, and take traditional photographs of their teeth and provide this information to SDC; (2) digital 3-dimensional images of customers' teeth and gums are taken either at an in-person visit to a SmileShop/SmileBus, or impressions are made via a purchase of a doctor-prescribed at-home impression kit, the results of which are then scanned and turned into 3D images of the customer's teeth and gums; (3) the resulting digital 3-dimensional images and other customer information are sent to highly trained lab technicians at a dental lab, working under the direct supervision of more than 60 dentists and orthodontists for quality assurance purposes, to create a draft treatment plan; (4) a state-licensed dentist or orthodontist will remotely review the customer's clinical information and draft treatment plan; (5) if the state-licensed dentist or orthodontist determines that they have all of the clinical information needed to make an assessment and diagnosis, he or she will then determine whether the customer is a viable candidate for clear aligner therapy using a remote platform and prescribe aligner therapy if appropriate, and will review, modify, reject or approve the draft treatment plan; (6) if the state licensed dentist or orthodontist ultimately approves a treatment plan containing a potential course of custom-made clear aligners, the plan is transmitted to the customer for review and approval; (7) if the customer wishes to proceed with treatment, the state licensed dentist or orthodontist who approved the customer for treatment issues the prescription for the manufacturing of the aligners; (8) aligners are shipped to the customer, and (9) the state-licensed treating dentist or orthodontist who prescribed the aligner therapy reviews the customer's clinical progress through a remote teledentistry platform.[5] ███████████████

████████████████████████████████████████████

██████████████████████████████████.[6]

---

[5]   *See also,* SmileDirectClub, Inc., Form S-1, 2019, at 5.
[6]   Interview with Philip Harrison, 10/19/2020, SDC's Vice President of Strategy & Corporate Development.

### ii.  Candid

10.   Candid is also a company that offers DSO services and a teledentistry platform to state licensed dentists and orthodontists to treat their patients with clear aligner therapy without the need to see their patient in person.[7]  Candid was founded in 2017 and has served tens of thousands of customers.[8]  I have been informed that Candid's treatment model involves the following steps:  (1) customers complete their dental and health histories and identify their chief concerns about their smiles; (2) digital 3-dimensional images of customers' teeth and gums are taken either at an in-person visit to a Candid Studio, or impressions are made via a purchase of an  at-home impression kit, the results of which are then scanned and turned into 3D images of the customer's teeth and gums; (3) the resulting digital 3-dimensional images and other customer information are sent to lab technicians at a dental lab to create a draft treatment plan; (4) a dentist or orthodontist will remotely review the customer's clinical information and draft treatment plan and will determine if additional information is needed before making an assessment and diagnosis for treatment; (5) if the dentist or orthodontist determines whether the customer is a viable candidate for clear aligner therapy using a remote platform and prescribe aligner therapy if appropriate, and will review, modify, reject or approve the draft treatment plan; (6) if the dentist or orthodontist ultimately approves a treatment plan, the plan is transmitted to the customer for review and approval; (7) if the customer wishes to proceed with treatment, the dentist or orthodontist who approved the customer for treatment issues the prescription for the manufacturing of the aligners; (8) aligners

---

[7]    Candid, "Why Candid?" https://www.candidco.com/how-it-works (accessed 9/3/2020).
    Business Insider, "A $88-a-month startup that wants to help straighten your teeth just raised $15 million," 11/21/2017,   https://www.businessinsider.com/candid-co-teeth-straightening-orthodontics-startup-raises-15-million-2017-11.
[8]    Candid, "About Us," https://www.candidco.com/about (accessed 9/3/2020).
    BusinessWire, "Candid Co. Raises $15 Million in Series A Financing," 11/21/2017,
https://www.businesswire.com/news/home/20171121005244/en/Candid-Raises-15-Million-Series-Financing.

are shipped to the customer; and (9) the state-licensed treating dentist or orthodontist who prescribed the aligner therapy reviews the customer's clinical progress through a remote teledentistry platform.[9]

## B. Platforms

### i. SmileShop

11.    As a first step to obtaining clear aligners, SDC customers may choose use SDC's website to book an appointment to take a free, in-person 3D oral scan at a SmileShop.[10]  During the 30-minute appointment, one of SDC's team members, called SmileGuides (who are not dentists or orthodontists and do not assess, diagnose or treat customers), use a handheld intraoral camera that takes approximately 6,000 photos per second to create a highly detailed digital map of the customer's smile.[11]  As of the date of SDC's IPO, there were over 350 SmileShops globally, the majority of which were located in the United States.[12]  In addition to stand-alone SmileShops, SDC has opened SmileShops in partnership with other retailers.[13]  As of October 2019, SmileShops accounted for 85-90% of customer teeth scans versus at-home impression kits.[14]  In-store scans fell significantly in Q2 2020 due to store closures resulting from the COVID-19 pandemic; however, the share of in-store scans has subsequently increased to 40-50% by August 12, 2020 as SmileShop locations started to reopen.[15]

---

[9]     *See also,* Candid, "Why Candid?" https://www.candidco.com/how-it-works (accessed 9/3/2020).

[10]    SmileDirectClub, Inc., Form 10-K, 2019, at 3.

[11]    SmileDirectClub, Inc., Form 10-K, 2019, at 3.

[12]    SmileDirectClub, Inc., Form 10-K, 2019, at 3.

         There are about 325 SmileShops in the United States.  *See*, Jefferies, "SDC Knows DTC: The Clear Leader in At-Home Aligner Therapy; Initiate at Buy," 10/7/2019, at pdf page 4.

[13]    SmileDirectClub, Inc., Form 10-K, 2019, at 4.

[14]    J.P.Morgan, "There's a Lot to Smile About; Initiating at OW, $31 PT," 10/7/2019, at 5.

[15]    Refinitiv Streetevents, "Q2 2020 SmileDirectClub Inc Earnings Call," 8/12/2020, at 8 and 13.

         According to SDC's CFO: "Since Q2, we have had a controlled approach to reopening our SmileShops, and we expect that to continue for many months. Today, we have 71 shops opened in 57 cities across 8 countries. The flexibility of our SmileShop model provides us the opportunity to rebuild a much leaner SmileShop network compared to pre-COVID, thereby enhancing the margin profile of our business."

### ii.  Candid Studios

12.    As a first step to obtaining clear aligners, Candid customers can use Candid's website to book an appointment to visit a Candid Studio.[16]  During the 30-minute appointment, the customer's teeth will be scanned with an intraoral digital scanner that projects a beam of structured light onto the teeth and gums.[17]  The person performing this scan is not a dentist or orthodontist and does not treat the patient.[18]  According to Candid's website, there are 18 Candid Studios throughout the United States as of October 2020.[19]  A 2020 article by Business Insider noted certain advantages of Candid's allegedly infringing Candid Studios experience relative to its fully at-home scanning option:[20]

> "I used the starter kit to send in photos and impressions at the beginning of my treatment and visited a Candid Studio in New York to get a final teeth scan at the end, so I can speak to both experiences. The at-home kit has you mix putty, stick it in five trays, and take your own impressions of your teeth. If you have a sensitive gag reflex, this part can be tricky to manage on your own, and it might be useful to have a friend nearby to assist.
>
> You'll also take photos (you'll definitely need a friend for this one) of various angles of your bite, with the help of a cheek stretcher to get a clear shot.
>
> While I didn't have difficulty making impressions, I did have to go back and forth with the Candid support team for good photos. It was a little frustrating that I couldn't get the photos right the first time, but the support team was very patient and helpful in moving the process forward, and even hopped on a call with me to clarify confusion about what they were looking for in the photos.

---

[16]     Candid, "Considering a Candid Studio visit," https://www.candidco.com/faq/p/im-booking-at-a-candid-studio (accessed 9/3/2020).

[17]     Candid, "Considering a Candid Studio visit," https://www.candidco.com/faq/p/im-booking-at-a-candid-studio (accessed 9/3/2020).
        Candid "How does a scan work?" https://www.candidco.com/faq/q/how-does-a-scan-work (accessed 9/3/2020).

[18]     Candid, "Is there an orthodontist onsite at the studio?" https://www.candidco.com/faq/q/orthodontist-on-site-at-studio (accessed 9/29/2020).

[19]     Candid, "Locations," https://www.candidco.com/studios (accessed 10/22/2020).

[20]     Business Insider, "I got my teeth straightened through an online service called Candid for under $2,000 — here's how it works," 4/24/2020, https://www.businessinsider.com/candid-review-clear-teeth-straightening-aligners.

> Overall, the at-home option is best for those who want to take photos and impressions on their own time and in the comfort of their own home, who can't make it to a Candid Studio during regular business hours, or don't live near a Candid Studio.
>
> Meanwhile, if you make an appointment at or walk in to a Candid Studio, you'll enter a nicely designed facility that feels more spa-like than dentist-like and work with an experienced specialist. They use an optical laser scan to sweep over all areas inside your mouth and create a digital model of your teeth. Since you're in the hands of an expert here, the studio option could be faster and less frustrating, but only if you do happen to live near a Candid Studio."

## C. Competition

13.    I understand that SDC and Candid both offer a teledentistry platform for doctor-prescribed direct-to-consumer teeth alignment via clear aligners without the customer physically seeing a dentist or an orthodontist.  Clear aligners are suitable for individuals who do not prefer braces or do not have time to visit a dentist or orthodontist often.[21]  Clear aligners may not be suitable for individuals who have complex orthodontic needs, need orthodontic surgery or a device that widens their palate.[22]

14.    SDC notes that it competes with a handful of smaller companies in the direct-to-consumer clear aligner industry, including Candid, Smilelove and SnapCorrect.[23]  SDC also notes that it faces competition from more well-established competitors via traditional orthodontics, which requires multiple in-person office visits, such as treatment options provided by Align Technology, Inc. ("Align"), the

---

[21]    Candid, "9 Questions About Clear Aligners, Answered,"
https://www.candidco.com/theimpression/article/questions-about-clear-aligners (accessed 10/1/2020).
[22]    Candid, "9 Questions About Clear Aligners, Answered,"
https://www.candidco.com/theimpression/article/questions-about-clear-aligners (accessed 10/1/2020).
[23]    SmileDirectClub, Inc., Form 10-K, 2019, at 9.
    Smilelove is a teledentistry service that provides customers with invisible aligners, in which customers' teeth are impressed via an at-home kit.  *See*, Smilelove, "How it works," https://smilelove.com/ (accessed 9/4/2020).
    SnapCorrect is a teledentistry service that provides customers with clear aligners, in which customers' teeth are impressed via an at-home kit.  *See*, SnapCorrect, "It's a Snap," https://snapcorrect.com/ (accessed 9/4/2020).

maker of Invisalign.[24]   For its part, Candid has identified SmileDirectClub, Invisalign, and byte as competitors.[25]  Of note, SDC and Candid appear to be the only two direct-to-consumer teledentistry platforms for clear aligner treatment in the United States that offer customers the option to visit a brick-and-mortar retail location (*e.g.*, a SmileShop or Candid Studio) to obtain intraoral scans to start the clear aligner process without having to visit a dentist or orthodontist.[26]

15.     A comparison of SDC, Candid, and other orthodontic treatment options is provided in the following table (see also Attachment B-4):

### Table 1: Comparison of Select Orthodontic Treatment Options

| Characteristics | SDC | Candid | Smilelove | SnapCorrect | Byte | Invisalign |
|---|---|---|---|---|---|---|
| Current Standard Treatment Price (without financing) | $1,950 (formerly $1,895) | $2,400 (formerly $1,900) | $1,895 - $2,195 | $1,749 | $1,895 | $3,000 - $8,000 |
| On-Site Scanning? | Yes | Yes | No | No | No | Yes |
| Requires Dentist/Orthodontist Visit? | No | No | No | No | No | Yes |
| Starter Kit / Current Standard Starter Kit Price | Yes - $59 | Yes - $95 | Yes - $250 | Yes - $95 | Yes - $95 | No |
| Financing Options? | Yes | Yes | Yes | Yes | Yes | Yes |
| Remote Monitoring? | Yes | Yes | No | No | Yes | Yes |
| Covered Under Insurance? | Yes | Yes | Yes | Yes | Yes | Yes |
| Customer Support? | Yes | Yes | Yes | Yes | Yes | Yes |
| Professionals | Dentists and orthodontists | Orthodontists | Orthodontists | Dentists | Orthodontists | Dentists and orthodontists |

16.     A William Blair analyst report from October 2019 placed SDC, Candid, Smilelove, SnapCorrect, and byte within the "direct-to-consumer clear aligner

---

[24]     SmileDirectClub, Inc., Form 10-K, 2019, at 9-10.
        Align, "Who we are," https://www.aligntech.com/ (accessed 9/4/2020).
[25]     Candid, "Why Candid?" https://www.candidco.com/how-it-works (accessed 9/3/2020).
        Byte is a teledentistry service that provides customers with clear aligners, in which customers' teeth are impressed via an at-home kit.  *See*, Byte, "How byte works," https://www.byteme.com/ (accessed 9/4/2020).
[26]     Complaint for Patent Infringement, 4/29/2020, at ¶ 57.

market" segment, while Align (and certain others) were categorized within the "doctor-directed clear aligner market" segment.[27]   The report further noted that: "*SmileDirectClub is the pioneer in the direct-to-consumer clear aligner space, and we estimate it has approximately 95% market share in this emerging channel. We estimate that by the end of 2019, SmileDirectClub will have started approximately 453,000 cases. Although SDC is the only public competitor in this space at present, we believe that Candid is the next-largest competitor, with approximately 2%-3% share, and we believe that there are a host of smaller competitors, including Byte, Smilelove, SnapCorrect, and Your Smile Direct, which account for another 2%-3% share of this channel.*"[28]

## D. The '522 Patent

17.   U.S. Patent No. 10,636,522, entitled "Arrangements for Intraoral Scanning," was filed on September 13, 2018 and issued on April 28, 2020.[29]   The '522 Patent lists Jordan Katzman, Alex Fenkell, David Katzman, Christopher Yancey, Josh Chapman, and Jessica Cicurel as the inventors and SmileDirectClub LLC as the assignee.[30]   The abstract of the '522 patent reads as follows:[31]

> "Systems and methods for arranging an intraoral scanning at a selected location. A user can request an appointment at a selected intraoral scanning site from a plurality of intraoral scanning sites. In requesting the appointment at the intraoral scanning site, the user can provide various information for reserving the appointment. The user can make the request online (e.g., via an internet scheduling website associated with the intraoral scanning site). The request can also include a selected time for the

---

[27]   William Blair, "A Direct-to-Consumer Clear Aligner Provider; Time to Join the Club? Initiating Coverage With Outperform Rating," 10/7/2019, at 13.

[28]   The same report presented data indicating that SDC and Candid hold market shares of 19.6% and 1.3%, respectively, if the direct-to-consumer and doctor-directed segments are combined.   Calculated based on estimated 2019 shipments as (453,000 SDC / 2,316,000 Total = 19.6%) and (30,000 Candid / 2,316,000 Total = 1.3%).
    *See* William Blair, "A Direct-to-Consumer Clear Aligner Provider; Time to Join the Club? Initiating Coverage With Outperform Rating," 10/7/2019, at 8 and 13.

[29]   The '522 Patent.

[30]   The '522 Patent.

[31]   The '522 Patent.

appointment. The schedule for the selected intraoral scanning site can be analyzed to determine that the selected time for the appointment is available. When the appointment is scheduled for the user, one or more automatically generated messages can be communicated to the customer."

18.    SDC alleges that Candid, via its brick-and-mortar Candid Studio platform, directly infringes, and induces others to infringe, independent claims 1, 13, 20, and 24, and various dependent claims of the '522 Patent.[32]  Representative claim 1 is shown below:[33]

"A method of producing aligners for repositioning one or more teeth of a user, the method comprising:

receiving, by an appointment management system, a request to schedule an appointment at an intraoral scanning site, the intraoral scanning site having an intraoral scanner configured to scan a mouth of a user, the appointment being for a technician to conduct an intraoral scan of the mouth of the user at the intraoral scanning site without a dentist or orthodontist physically seeing the user during the scheduled appointment, wherein the technician is not a dentist or an orthodontist;

scheduling, by the appointment management system, the appointment at the intraoral scanning site in accordance with the request;

generating and communicating, by the appointment management system, a message to a device of the user, the message including a confirmation confirming the scheduled appointment;

conducting, using the intraoral scanner, the intraoral scan at the intraoral scanning site during the scheduled appointment, the intraoral scan generating three-dimensional data of the mouth of the user;

causing generation, by a treatment plan computing system located at a treatment plan site, of a treatment plan for the user based on the three-dimensional data of the mouth of the user;

receiving an indication of an approval of the treatment plan by a dental or orthodontic professional, wherein the

---

[32]    Complaint for Patent Infringement, 4/29/2020, at ¶¶ 69 and 70.
[33]    The '522 Patent.

11

approval is received without the dental or orthodontic professional having physically seen the user;

producing, at a fabrication site, a plurality of aligners based on the treatment plan, the plurality of aligners specific to the user and being configured to reposition one or more teeth of the user in accordance with the treatment plan; and

sending the plurality of aligners from the fabrication site directly to the user, wherein the user receives orthodontic treatment without ever having physically seen the approving dental or orthodontic professional."

## III.   Irreparable Harm

## A. Overview

19.   I understand that irreparable harm and the adequacy of available monetary compensation are factors considered by courts in evaluating whether injunctive relief is appropriate.  I understand that a party may be entitled to a preliminary injunction if the party demonstrates that it is likely to suffer irreparable harm in the absence of injunctive relief.  I understand that courts have considered a number of economic factors in evaluating whether harm would be irreparable, including: (1) loss of future sales and market share; (2) price erosion; (3) harm to reputation / goodwill; (4) harm to business activities; and (5) the degree to which a party can be reliably compensated for the harm it incurs.[34]

20.   The information and economic circumstances here illustrate that SDC has suffered and will continue to suffer irreparable harm as a result of Candid's alleged infringement of the '522 Patent and that monetary remedies may be inadequate to compensate SDC for such harm, based upon the following: (1) the

---

[34]     *See*: *eBay Inc. v. MercExchange*, LLC, 547 U.S. 388 (2006); *Bayer HealthCare, LLC v. United States FDA*, 942 F. Supp. 2d 17, 26 (D.D.C. 2013); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010) (listing "harm to . . . market share, revenues, and brand recognition" as indicators of irreparable harm); *Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1304 (Fed. Cir. 2013) ("Under this court's precedent, '[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.'" (quoting *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012)); *Apple, Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370 (Fed. Cir. 2012).

economic harm to SDC will be direct and substantial (Section III.B below); (2) the economic harm to SDC is occurring at a critical time in SDC's development (Section III.C); (3) the economic harm to SDC will be irreparable and difficult to fully quantify (Section III.D); (4) the economic harm to SDC may not be compensable by Candid (Section III.E); and (5) there is a nexus between SDC's harm and Candid's alleged infringement (Section III.F).

## B. The economic harm to SDC will be direct and substantial

21.    The economic harm faced by SDC will be direct and substantial.  In reaching this conclusion, I have considered several factors, including (1) direct competition, (2) overlapping customers and geographies, and (3) overlapping target marketing demographics.



22.    **[1] Candid and SDC are direct competitors**.  The Federal Circuit has held that *"Where two companies are in competition against one another, the patentee suffers the harm — often irreparable — of being forced to compete against products that incorporate and infringe its own patented inventions."*[35]  Here, Candid and SDC are direct competitors for direct-to-consumer clear aligners and Candid is currently SDC's closest competitor in terms of product similarity and degree of competition.  As discussed above, SDC and Candid are the only two direct-to-consumer companies that offer an option to visit on-site retail locations for intraoral

---

[35]    *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F. 3d 1336 - Court of Appeals, Federal Circuit 2013. Emphasis added.

scans to start the clear aligner process without having to physically visit a dentist or orthodontist, as both SDC's SmileShops and Candid's Candid Studios practice the patented inventions. Indeed, SDC and Candid have both identified the other as a competitor.[36] Third parties also describe SDC and Candid as direct competitors, for example: (1) GlobalData listed Candid as one of SDC's key competitors;[37] (2) J.P. Morgan market analysts described Candid as a "true direct competitor" to SDC;[38] (3) William Blair market analysts stated that Candid is the "next-largest competitor" to SDC in the "direct-to-consumer clear aligner space;"[39] and (4) Racked, a Vox media publication, described Candid as "…SDC's most viable competitor."[40]

23.    **[2] Candid and SDC service overlapping customers and geographies**. Not only do Candid and SDC directly compete in the sense that they both offer competing teledentistry platforms, they also service overlapping customer populations and geographies, as evidenced by the overlapping footprints of Candid Studios and SmileShops. This overlap indicates that Candid is competing for many of the same customers seeking in-store scanning that SDC's SmileShops were established to serve. Namely, as of October 2020, Candid lists 18 Candid Studio locations in the United States on their website. See Attachment B-3. ███████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████

---

[36]    SmileDirectClub, Inc., Form 10-K, 2019, at 9-10.
       Candid, "Why Candid?" https://www.candidco.com/how-it-works (accessed 9/3/2020).
[37]    GlobalData, "SmileDirectClub LLC," 3/2019, at 2.
[38]    J.P.Morgan, "There's a Lot to Smile About; Initiating at OW, $31 PT," 10/7/2019, at 5.
[39]    William Blair, "A Direct-to-Consumer Clear Aligner Provider; Time to Join the Club? Initiating Coverage With Outperform Rating," 10/7/2019, at 13.
[40]    Racked, "The Cutthroat World of Orthodontic Invisible Aligner Startups," 8/8/2019, https://www.racked.com/2018/8/8/17661016/smile-direct-club-invisible-aligners-invisalign-candid-co.



24. **[3] Candid's marketing directly targets prospective SDC customers**. Candid's marketing directly targets prospective SDC customers, indicating that Candid's goal is to capture the same customers that may otherwise have purchased from SDC. █████████████████████████████████████████████████████████████████████████████████████████████.[41]

Additionally, Candid's blog compares its services directly to SDC's to help convince

---

[41]    Interview with Philip Harrison, 10/19/2020, SDC's Vice President of Strategy & Corporate Development. I further understand that, because there is limited inventory for ad space related to these search terms, Candid's competition with SDC for these search terms increases SDC's customer acquisition costs relative to what they would be absent the alleged infringement.

prospective SDC customers to choose Candid: *"Plus, we offer two easy ways to get started: our at-home starter kit or a 30-minute visit to the Candid Studio™.  But of course we aren't your only option for teeth straightening at home. What's the difference between Candid and Smile Direct Club, another at-home teeth aligners company?"*[42]  Although Candid also promotes certain ancillary aspects of its Candid Studios experience as alleged differentiators versus SDC (*e.g.,* "white-glove customer care"),[43] I understand that many of the key aspects of the current Candid Studios implementation (*e.g.,* in-store scanning and much of the overall scheduling and treatment generation process) are enabled by the '522 Patent.[44] ██████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████[45]  Absent a preliminary injunction, Candid's marketing efforts related to its allegedly infringing Candid Studios platform will likely divert prospective SDC customers to Candid, causing SDC to lose sales and market share relative to what it would otherwise achieve if it were to maintain exclusivity over its patented concepts.

25.     I further note that, as a matter of economics and given the nature of the products and competition here, it is likely that continued competition from Candid's infringement will cause ongoing price pressure and potential price erosion for SDC. For instance, SDC has noted in its annual filings with the SEC that *"[i]ncreased competition may result in price reductions, reduced gross margins, reduced profitability, and loss of market share."*[46]  At times, Candid and SDC have run concurrent promotions with reduced pricing for certain of their product offerings,

---

[42]     Candid, "What's the difference between Candid and Smile Direct Club?" https://blog.candidco.com/whats-the-difference-between-candid-and-smile-direct-club-a957ffed32d2 (accessed 9/4/2020). Emphasis added.
[43]     Candid, "What's the difference between Candid and Smile Direct Club?" https://blog.candidco.com/whats-the-difference-between-candid-and-smile-direct-club-a957ffed32d2 (accessed 9/4/2020). Emphasis added.
[44]     Declaration of Jessica Cicurel, at ¶¶ 7-14.
[45]     Interview with Philip Harrison, 10/19/2020, SDC's Vice President of Strategy & Corporate Development.
[46]     SmileDirectClub, Inc., Form 10-K, 2019, at 23.  Emphasis added

indicating that Candid and SDC compete to a certain extent on the basis of price.[47] While Candid has generally set its prices at parity or slightly above SDC's prices,[48] the presence of infringing close competition imposes limits on SDC's ability to charge prices that capture the improvements of its patented innovations (*i.e.,* Candid's pricing influences customer expectations and choices for pricing of similar products).

26.    Finally, SDC faces additional harm, discussed further below.

---

[47]    For example, Candid and SDC both ran promotional offers with reduced pricing in September 2020.
    *See*, Candid, "Products: Clear Aligner Treatment," https://www.candidco.com/products/clear-aligners (accessed 9/18/2020). *See also*, SmileDirectClub, "Pricing for everyone," https://smiledirectclub.com/pricing/ (accessed 9/10/2020).
[48]    Candid was initially priced at $1,900 but was raised to $2,400 in c. 2020.
    See Table 1 above and Attachment B-4.
    *See*, Insider, "Candid now offers remote monitoring that improves the way you straighten your teeth at home — and its starter kit is now 50% off," 4/1/2020, https://www.insider.com/candid-discount-on-teeth-aligners#:~:text=Learn%20more.&text=Candid%2C%20an%20online%20orthodontic%20company,up%20from%20%241%2C900%20to%20%242%2C400;
    Candid, "How much does Candid cost?" https://www.candidco.com/faq/q/how-much-does-candid-cost (accessed 9/10/2020).
    SDC was initially priced at $1,895 but was raised to $1,950 in c. 2020.
    *See*, SDC, "Smile Direct Club Kicks off Second Annual Gift of Grin Contest," 10/7/2019, https://investors.smiledirectclub.com/news-releases/news-release-details/smile-direct-club-kicks-second-annual-gift-grin-contest.
    SmileDirectClub, "Pricing for everyone," https://smiledirectclub.com/pricing/ (accessed 9/10/2020).
[49]    For example, Candid and SDC historically charged standard prices of $1,900 and $1,895, respectively, for clear aligner treatment (without financing).  Candid subsequently increased its price by $500 to $2,400; during the same time, SDC increased its price by only $55 to $1,950.
    See Table 1 above and Attachment B-4.
[50]    TechCrunch, "This dental startup will straighten your teeth for less than Invisalign," 9/14/2017, https://techcrunch.com/2017/09/14/candid-dental-startup-teeth-alignment/#:~:text=Candid%2C%20which%203D%20prints%20its,can%20cost%20up%20to%20%248%2C000.

## C. The economic harm to SDC is occurring at a critical time in SDC's development

27.    For the reasons stated in Section III.B, SDC is likely to suffer economic harm absent a preliminary injunction.  While it may be possible to calculate some portion of this harm, the harm suffered by SDC will be irreparable because it is occurring at a critical time in SDC's growth and development and thus may be difficult to fully measure and quantify, even in hindsight.   In reaching this conclusion, I have considered several factors, including (1) SDC is at an early and critical growth stage; (2) ███████████████████████████████ ███████ ; (3) Candid's infringement causes SDC reputational harm and loss of goodwill; (4) Candid's infringement causes confusion in the marketplace; and (5) Candid's infringement disrupts SDC's referral networks and ancillary sales opportunities.

28.    **[1] SDC is at an early and critical growth stage**. SDC was founded in 2014,[51] completed its initial public offering ("IPO") in late 2019,[52] and is classified as an "emerging growth company" under the JOBS Act.[53] Thus, despite being a leader in the teledentistry market, SDC is still in an early and critical stage of its growth.  Indeed, SDC describes itself as *the leading player in this **early but massive opportunity**."*[54]   In addition, J.P. Morgan market analysts described that *"[t]he global addressable market for malocclusion is significant, and with **less than 1% of SmileDirectClub's target market receiving care today**, there is a long, multi-year runway for global growth."*[55]  Because SDC is at an early stage in its growth, the impact of any significant disruption (including Candid's alleged infringement)

---

[51]    SmileDirectClub, Inc., Form 10-K, 2019, at 3.
[52]    SmileDirectClub, Inc., Form 10-K, 2019, at F-10.
[53]    SmileDirectClub, Inc., Form 10-K, 2019, at 48.
[54]    SmileDirectClub, Inc., Form 10-K, 2019, at 2.  Emphasis added.
[55]    J.P.Morgan, "There's a Lot to Smile About; Initiating at OW, $31 PT," 10/7/2019, at 1.  Emphasis added.

18

on SDC's overall business operations and growth trajectory is magnified and may be difficult to project accurately.  For example, SDC informed its investors that *"We have a limited operating history and have grown significantly in a short period of time… If consumers prove unwilling to adopt our teledentistry model as rapidly or in the numbers that we anticipate, our operating results could be materially harmed."*[56]

29.



---

[56]     SmileDirectClub, Inc., Form S-1, 2019, at 26-27.
[57]     For example, SDC's Form 10-K states: "From inception through the present, we have spent significant funds in organizational and start-up activities, to recruit key managers and employees, to develop our clear aligners, to develop our manufacturing and member support resources, and for research and development."
         *See* SmileDirectClub, Inc., Form 10-K, 2019, at 22.
[58]     Candid, "The Candid Studio™ experience is here, and soon, it'll be everywhere," 6/4/2018, https://blog.candidco.com/candid-store-4ffe6ea6612d.
[59]

         As another example, Credit Suisse estimates that SDC earns a contribution margin of $587 per aligner order. *See*, Credit Suisse, "Setting Things Straight: Initiate Outperform," 10/7/2019, at 18.

19



30.   **[3] Candid's infringement causes SDC reputational harm and loss of goodwill**. SDC has incurred significant marketing and other expenses with the intent of establishing itself as the innovator of the patented concepts in the minds of customers and other relevant marketplace participants, such as SDC's insurance partners, dental-service partners and prospective investors.  However, in the absence of an injunction, SDC will continue to face competition from Candid, which claims to have innovated the patented concepts on its own.  For example, Candid claims that their diagnostic process was "[d]eveloped by top-tier orthodontists," and that they looked into the aligner industry and "…knew [they] could make a difference."[61] As an initial matter, Candid's mere presence on the market may diminish SDC's

---

[60]      SmileDirectClub, Inc., Form 10-K, 2019, at 23.
[61]      Candid, "About Us," https://www.candidco.com/about (accessed 9/3/2020).
          Candid also stated that the Candid Studio is "…a milestone in raising the standard of care for at-home orthodontics" and "…is unlike anything you've seen or experienced before in healthcare."  *See*, Candid, "The Candid Studio™ experience is here, and soon, it'll be everywhere," 6/4/2018, https://blog.candidco.com/candid-store-4ffe6ea6612d.

reputation as an innovator in the minds of customers and other relevant marketplace participants.  Some customers may see SDC's SmileShops as simply one of several options, rather than as the offerings of the innovator of the patented technology. Candid's own claims to be the innovator compound the issue: some customers may incorrectly view Candid as the innovator and see SDC as a "copy-cat" or "knock-off," and thus view SDC's offering as inferior.  As a result, customers persuaded by Candid's claims may be willing to pay less for SDC's products and services than they otherwise would have (if they choose to use SDC at all).  This reputational harm and loss of goodwill faced by SDC is particularly significant and difficult to quantify.  Indeed, the Federal Circuit has discussed the linkage between a defendant's infringement and reputational harm to a plaintiff that has not previously licensed others to use its patented inventions, noting in one case that "*the evidence shows that [Plaintiff] had never licensed the infringed patents, and intentionally chose not to, so that it could maintain market exclusivity.  Exclusivity is closely related to the fundamental nature of patents as property rights.  It is an intangible asset that is part of a company's reputation, and here, [Plaintiff]'s exclusive right to make, use, and sell the patented inventions is under attack by [Defendant]'s infringement.*"[62]

31.    **[4] Candid's infringement causes confusion in the marketplace**. Because SDC is at an early stage in its growth, it has not had the opportunity to establish its brand fully in the minds of customers or other marketplace participants. As such, the risk of confusion with similarly branded products in the marketplace is greater than it would be if SDC had a longer-established history and brand.  In this case, Candid's marketing strategy is similar to SDC's, and there is evidence that this causes significant confusion in the marketplace. ████████████████████

---

[62]    *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F. 3d 1336 - Court of Appeals, Federal Circuit 2013. Emphasis added.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████[63]      The

following examples show the similarity of Candid's marketing of its Candid Studio

platform relative to SDC's marketing of its SmileShop platform.   Absent a

preliminary injunction, there is a risk that SDC will lose brand awareness, and/or

reputational value due to any resulting confusion in the marketplace:

---

[63]      Interview with Philip Harrison, 10/19/2020, SDC's Vice President of Strategy & Corporate Development.

**Figure 1: Website Marketing – "Am I A Candidate?"**
**SDC (top) vs. Candid (bottom)[64]**



---

[64]     SmileDirectClub, "How it works," https://smiledirectclub.com/how_it_works/ (accessed 9/7/2020).
Candid, "Why Candid?" https://www.candidco.com/how-it-works (accessed 9/3/2020).

**Figure 2: Website Marketing – "How It Works"**
**SDC (top) vs. Candid (bottom)[65]**





STEP 1:
**Our dental team designs your plan.**
We make a 3D image of your teeth that lets us see what's going on and helps us design your treatment plan. There are two easy ways to make this image: You can visit a SmileShop for an in-person scan, or use our at-home kit to create impressions you can send to us. A licensed dentist or orthodontist reviews and approves your custom treatment plan.

STEP 2:
**Our dental team creates your aligners.**
We share a preview of your smile transformation, then create your custom aligners. We'll ship them to you all at once, so there's no wait. Your assigned dentist or orthodontist will have regular virtual check-ins, guiding your treatment remotely from beginning to end. And you'll get premium teeth whitening that gives results in just one week.

STEP 3:
**You show the world a new smile.**
After completing treatment and checking with your doctor, you can purchase a set of retainers. You'll wear them only at night to keep your beautiful new smile in place. Feel free to order touch-up whitening treatments any time.





Step 1
**Show us your teeth**
Get a free scan at a Candid Studio near you or order an at-home starter kit.

Step 2
**Our doctors will assess your case**
Then they'll design your treatment plan. You'll get a 3D preview when it's ready.

Step 3
**Your aligners, delivered**
You'll get all your aligners in a single box, along with premium whitening.

32.    **[5] Candid's infringement disrupts SDC's referral networks and ancillary sales opportunities**. I understand that at least 20% of SDC's customers come through referrals from previous SDC customers.[66] ███████████████

---

[65]    SmileDirectClub, "Home," https://smiledirectclub.com/ (accessed 9/7/2020).
        Candid, "Why Candid?" https://www.candidco.com/how-it-works (accessed 9/3/2020).
[66]    SmileDirectClub, Inc., Form S-1, 2019, at 8.

24



33.

Moreover, to the extent a Candid customer has a negative experience and shares that experience with others who may have otherwise considered SDC, thus causing those potential customers to not choose clear aligner treatment altogether, Candid's infringement will have limited the total pool of potential SDC customers and referrals further.

34.     In addition, the long-term and permanent nature of the commitment required for clear aligners exacerbates referral losses induced by Candid to SDC.  I understand that once customers have begun a treatment with Candid, they are committed to the treatment for an average of six months, and up to eleven months.[69] Thus, those customers are locked into a Candid treatment for a considerable period of time during which they are unlikely to switch mid-treatment to another teeth alignment service, such as SDC's offerings.  Furthermore, customers who complete

---

[67]     Interview with Phil Harrison, SDC's Vice President of Strategy & Corporate Development.
[68]     Interview with Phil Harrison, SDC's Vice President of Strategy & Corporate Development.
[69]     Candid, "How long is the treatment?" https://www.candidco.com/faq/q/how-clear-are-aligners (accessed 9/28/2020).

a clear aligner treatment with Candid are unlikely to seek additional treatment with SDC because their teeth have already been aligned.  In other words, customers who choose to use Candid due to its alleged infringement are unlikely to ever become customers of or provide referrals for SDC.

35.   Because SDC is at an early stage in its business and is seeking to both (i) capture existing potential customers and (ii) expand the potential set of customers through referrals based on positive experiences at its SmileShop locations, any harm caused by Candid's infringement in this regard would likely be irreparable.

**D. The economic harm to SDC will be irreparable and difficult to fully quantify**

36.   For the reasons described above, the total amount of economic harm faced by SDC will be irreparable and difficult to fully quantify, such that available monetary remedies, if any, would not fully compensate SDC for the harm it has suffered and will suffer.  While a certain amount of quantification may be possible (*e.g.*, the number Candid customers that would otherwise have been customers of SDC, multiplied by SDC's expected incremental profit per customer), fully capturing and quantifying all of the potential harm may not be possible, even looking backwards after such harm has occurred.

37.   As discussed, there are a number of elements of economic harm to SDC: (1) loss of sales and market share, (2) potential price erosion, (3) disruption to SDC's business planning caused by non-exclusivity over the patented concepts, (4) reputational harm and loss of goodwill, (5) harm due to confusion in the marketplace, and (6) disruption of SDC's referral networks and ancillary sales opportunities. While certain aspects of this harm may be quantifiable, other elements of loss will be more difficult to quantify, since SDC's growth, reputation, and ultimate market penetration will be difficult to fully predict but for Candid's infringement.  For example, it may be possible to compensate SDC for the sales actually earned by

26

Candid, but losses of customers who never exist because they did not receive a referral from an SDC customer may not be knowable or compensable.  Similarly, it may be difficult to know how strong SDC's growth and pricing would ultimately have been had they not faced increasing and ongoing competition from Candid's infringement.  Given the early stage of development and growth for SDC, these issues are particularly acute, such that any monetary remedy, to the extent it is available, would likely undercompensate SDC for Candid's infringement by an unknowable amount.

**E. The economic harm to SDC may not be compensable by Candid**

38.     Even beyond the amounts that may be sought by SDC as eventual damages (*e.g.,* lost profits, reasonable royalty, etc.), Candid may not have the resources to later pay such an award, and, thus, SDC's harm would be irreparable because it may not be compensable by Candid.  For example, according to a 2019 Forbes article, "…Candid is not currently profitable and does not have immediate plans for profitability…"[70]  Even if Candid were profitable, it is possible that the full amount of SDC's harm would exceed Candid's historical profits, revenues, and/or asset base, given SDC's comparatively greater size and the impact of elements of harm related to reputation and price pressures.  Furthermore, despite Candid's expansion plans, Candid's current store footprint is limited to 18 stores, implying a potentially limited pool of assets to draw upon should Candid face any financial constraints in the future that would affect its ability to pay any monetary damages.  Additionally, Candid's access to future capital may be constrained by its status as a privately listed company without access to the public capital markets.  Lastly, Candid faces uncertainty due to the COVID-19 pandemic which may further

---

[70]     Forbes, "Something To Smile About: Candid Raises $63 Million To Be The Warby Parker Of Braces," 4/16/2019,   https://www.forbes.com/sites/alexandrasternlicht/2019/04/16/something-to-smile-about-candid-raises-63-million-to-be-the-warby-parker-of-braces/#12e2fabbb256.

pressure its ability to generate cash flows and/or raise additional financing to pay any damages award.

**F. There is a nexus between SDC's harm and Candid's alleged infringement**

39.    In this case, there is a clear nexus between the economic harm suffered by SDC and Candid's alleged infringement of the '522 Patent, for the reasons discussed below.

40.    **[1] The '522 Patent is important to the Candid Studios implementation**.  I understand that the '522 Patent and related patented technologies cover important aspects of the current implementation of the Candid Studio platforms, including Candid's ability to offer customers the option to visit on-site location for an intraoral scan to start the clear aligner process.[71]  Therefore, Candid could not operate its current Candid Studio implementation without use of the '522 Patent or offer the same benefits to customers related to the allegedly infringing aspects of the platform, such as those related to Candid's current implementation of an in-store scanning experience, if it changed its Candid Studio platform to avoid infringement of the '522 Patent.

41.    **[2] The patented Candid Studios platform is important to Candid's business**.  According to Candid, the Candid Studio differentiates Candid from other competitors.  Evidence of the importance of Candid Studios to Candid's business includes:

> a. Candid CEO interview with TechCrunch (2019): A 2019 TechCrunch interview with Candid's CEO noted that: "**The studios**, which are operated by Candid's orthodontists and dental assistants, **have attracted new customers**, Candid CEO Nick Greenfield told TechCrunch.  'When we launch a market, we see so many people

---

[71]    Declaration of Jessica Cicurel, at ¶¶ 7-14.

coming in and **it opens up a totally different subset of people**,' he said.  The <u>physical locations</u> also serve to provide <u>more information to people who bought impression kits online</u>.  '<u>The at-home business and Candid Studio play really synergistically with each other</u>,' Greenfield said.   Since last September, Candid has grown its revenues 4x."[72]

b. <u>Official Candid YouTube Video (2018)</u>: Candid's Chief Design Officer stated that "in Candid Studios, [customers] are going to have a chance to meet our people, touch the product, and understand what it is that we value.  And they feel like authors, they're part of the design process of their new smile, and that makes them really comfortable with our process."[73]

c. <u>Thinknum (2019)</u>: "…Candid's real-world presence gives customers the option — and opportunity — to come in to a studio to do a free consultation and scan.  The intimate, down-to-earth approach appears to be resonating with customers…"[74]

d. <u>Business Insider (2020)</u>: "*<u>Having gone through the starter kit for Candid, I can say that it's not very easy</u>* to take impressions and photos for yourself... *<u>If at all possible, we recommend visiting a physical studio location</u>*. It speeds up the process and eliminates the frustration of taking impressions yourself."[75]

---

[72]     TechCrunch, "Investors continue to pour money into dental startups," 4/9/2019, https://techcrunch.com/2019/04/09/investors-continue-to-pour-money-into-dental-startups/?guccounter=1. Emphasis added.
[73]     YouTube, "What's A Candid Studio? | Candid Clear Aligners," 6/19/2018, https://www.youtube.com/watch?v=Ye8hcAQQEh4.
[74]     Thinknum, "How Candid is moving in on SmileDirect and Invisalign's teeth straightening game," 8/20/2019, https://media.thinknum.com/articles/something-about-candid-care-and-smiledirectclub-locations/.
[75]     Business Insider, "SmileDirectClub vs. Candid — how the 2 popular dental aligner services compare, and what you should know before starting either," 4/1/2020, https://www.insider.com/smiledirectclub-vs-candid. Emphasis added.

42.    **[3] The patented SmileShop platform is important to SDC's business**.   The patented SmileShop model is also important to SDC's business. Evidence of the importance of SmileShops to SDC's business includes:

a.   <u>Evidence of market expansion due to in-store option:</u>



b.   <u>Demonstrated customer preference for on-site scanning:</u> As of 2019, SmileShops accounted for 85-90% of customer teeth scans versus at-home impression kits.[77]   In-store scans fell significantly in Q2 2020 due to store closures resulting from the COVID-19 pandemic; however, even amidst the pandemic, the share of in-store scans has subsequently increased to 40-50% by August 12, 2020 as SmileShop locations reopened.[78]   The high initial share of in-person scanning versus at-home impression kits and the resurgence of in-person scanning shares after the initial negative impact from the COVID-19 pandemic (indeed, even while the pandemic is ongoing)

---

[76]    Interview with Philip Harrison, 10/19/2020, SDC's Vice President of Strategy & Corporate Development.
[77]    J.P.Morgan, "There's a Lot to Smile About; Initiating at OW, $31 PT," 10/7/2019, at 5.
[78]    Refinitiv Streetevents, "Q2 2020 SmileDirectClub Inc Earnings Call," 8/12/2020, at 8 and 13.
    According to SDC's CFO: "Since Q2, we have had a controlled approach to reopening our SmileShops, and we expect that to continue for many months. Today, we have 71 shops opened in 57 cities across 8 countries. The flexibility of our SmileShop model provides us the opportunity to rebuild a much leaner SmileShop network compared to pre-COVID, thereby enhancing the margin profile of our business."

demonstrates that many customers value and prefer the in-person scanning process despite the availability of a fully remote option.

c. <u>In-store scans drive SmileShop customer visits</u>:   In a recent partnership, CVS placed SmileDirectClub in a number of its locations to "fit people for clear braces inside its drugstores."[79] CVS' Vice President of Beauty Maly Bernstein stated: "*<u>This was something customers did want and did appreciate being able to go to their local store to have that first scan done</u>*."[80]   Notably, Candid has recently followed SmileDirectClub in partnering with CVS "to offer appointments inside a select number of CVS Beauty IRL stores."[81]

d. <u>SDC Form S-1 (2019)</u>: "SmileShops have been a *<u>key driver in expanding access to care</u>* by reducing the friction of purchase and improving [SDC's] member conversion.*"[82]

e. <u>SDC Q3 2019 Earnings Call (2019)</u>: "More than 95% of [SDC] members surveyed would recommend [the] SmileShop experience to friends…"[83]

f. <u>J.P. Morgan (2019)</u>: "The expansion of *<u>SmileShops is key to</u>*

---

[79]   CNBC, "CVS will bring hundreds of SmileDirectClub shops to its stores, offering a cheaper way to straighten teeth," 4/25/2019, "https://www.cnbc.com/2019/04/25/cvs-is-opening-up-hundreds-of-smiledirectclub-shops-in-its-stores.html.
    *See also*, CVS Health, "CVS Health and Smile Direct Club Team Up to Expand Access and Affordability to Innovative Solution for Achieving a Straighter Smile," 4/25/2019, https://cvshealth.com/news-and-insights/press-releases/cvs-health-and-smile-direct-club-team-up-to-expand-access-and; and
    Yahoo Finance, "CVS will bring hundreds of SmileDirectClub shops to its stores, offering a cheaper way to straighten teeth," 4/25/2019, https://finance.yahoo.com/news/cvs-bring-hundreds-smiledirectclub-shops-050127608.html.
[80]   CNBC, "CVS will bring hundreds of SmileDirectClub shops to its stores, offering a cheaper way to straighten teeth," 4/25/2019, "https://www.cnbc.com/2019/04/25/cvs-is-opening-up-hundreds-of-smiledirectclub-shops-in-its-stores.html.  Emphasis added.
[81]   Candid, "New York - CVS Times Square,"
https://www.candidco.com/studios/nyc/new_york_cvs_times_square.
[82]   SmileDirectClub, Inc., Form S-1, 2019, at 10.  Emphasis added.
[83]   Thomson Reuters, "Q3 2019 SmileDirectClub Inc Earnings Call," 11/12/2019, at 3.

*SmileDirectClub's strategy* in that it both makes it easier to get patients in the door with no cost associated with the visit, builds the company's brand, and reduces sales friction."[84]

g. Digiday (2019): "For SmileDirectClub, physical stores… lower the barrier of entry and make it easier to fit customers for aligners."[85]

h. Smile Prep (2020): "SmileShops have made SmileDirectClub treatment more convenient, and their business has grown as a result."[86]

43.    **[4] Candid's infringement attracts customers that desire SDC's patented technology**.  By allegedly practicing the '522 Patent at its Candid Studios locations, Candid is attracting customers for whom SDC's patented technology is a desirable feature (*i.e.,* customers that desire and prefer the patented in-store experience with an in-store scan).  As a result, Candid is capturing related sales and market share that it otherwise would not have, and which otherwise would likely have accrued to SDC as the exclusive provider of the '522 Patented technology.  For the reasons discussed above, this directly harms SDC due to the similarity of SDC's and Candid's patented offerings and the nature of competition between SDC and Candid.

44.    **[5] Candid's infringement facilitates its omni-channel retail strategy**.  As discussed above, Candid, like SDC, offers both a fully remote, at-home teledentistry product as well as operating its brick-and-mortar locations.   I understand that SDC refers to this approach as an "omni-channel" retail strategy.  According to SDC, an omni-channel retail strategy helps a company convert

---

[84]    J.P.Morgan, "There's a Lot to Smile About; Initiating at OW, $31 PT," 10/7/2019, at 15. Emphasis added.
[85]    Digiday, "How SmileDirectClub is building out a physical retail network," 4/26/2019, https://digiday.com/retail/smiledirectclub-building-physical-retail-network/.
[86]    Smile Prep, "What's the Deal With SmileShops?" last updated 7/7/2020, https://smileprep.com/smiledirectclub-smileshops/.

potential customers and generally increases the revenue and profit that it earns from those customers: "*Customers are increasingly expecting the convenience of an e-commerce business, coupled with the support and consultation provided with an in-person experience. **<u>In this environment, consumer-facing businesses must combine digital experiences with strategic brick and mortar locations to successfully convert potential customers</u>**. This strategy is supported by an IDC Retail Insights report, which found that retailers who utilized omni-channel marketing strategies experienced a 15-35% increase in average transaction size, a 5-10% increase in loyal customers' profitability, and 30% higher customer lifetime value than those who market using only one channel.*"[87] ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████ [88] Moreover, a 2019 TechCrunch interview with Candid's CEO noted that "'***<u>The at-home business and Candid Studio play really synergistically with each other</u>***,' Greenfield said. *Since last September, Candid has grown its revenues 4x.*"[89] In this case, Candid's infringement has facilitated its own omni-channel retail strategy, which has likely helped it successfully convert potential customers that otherwise would have accrued to SDC.

45.     For the reasons stated above, I conclude that there is a clear nexus between the economic harm suffered by SDC and Candid's alleged infringement of the '522 Patent.

---

[87]     SmileDirectClub, Inc., Form S-1, 2019, at 103. Emphasis added.
[88]     Interview with Philip Harrison, 10/19/2020, SDC's Vice President of Strategy & Corporate Development.
[89]     TechCrunch, "Investors continue to pour money into dental startups," 4/9/2019,
https://techcrunch.com/2019/04/09/investors-continue-to-pour-money-into-dental-startups/?guccounter=1.
Emphasis added.

## IV.   Balance of Hardships

### A. Overview

46.    I understand that another factor considered by courts in evaluating injunctive relief is the balance of hardships.[90]   I understand that, in pursuing a preliminary injunction, a plaintiff can demonstrate that the balance of hardships tips in its favor.[91]   I understand that requiring a plaintiff to compete against its own patented invention in a narrow market may favor entry of a preliminary injunction.[92] I also understand that if a defendant can offer products or services that do not infringe the patent-in-suit that would be easy to deliver to the market, then the balance of hardships suggests that the defendant should favor pursuing a non-infringing course of market conduct.[93]

### B. Analysis

47.    Evidence and analysis indicate that the balance of hardships tips in favor of SDC in this case.   As discussed above, SDC is likely to face substantial ongoing economic harm, at a critical time for the company, if Candid were to remain on the market.   However, Candid may be negatively impacted, to a certain extent, if the infringing aspects of its Candid Studios platform were preliminarily enjoined and later allowed.   With that said, any harm to Candid is likely outweighed by the fact that, absent a preliminary injunction, SDC will be forced to compete against its own invention, and that part of Candid's business offerings include services that do not infringe the '522 Patent (and, thus, Candid will be able to mitigate certain aspects of

---

[90]      *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006); *Apple, Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370 (Fed. Cir. 2012).
[91]      *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).
         *Apple, Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012).
         *Altana Pharma AG and Wyeth v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceuticals Industries, Ltd.*, 566 F.3d 999, 1005 (Fed. Cir. 2009).
[92]      *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011);
         *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 809 F.3d 633, 646 (Fed. Cir. 2015).
[93]      *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013).

its harm).   Moreover, there is evidence that Candid reasonably could have anticipated that SDC would seek patent protection over the inventions that subsequently issued as the '522 Patent at the time it opted to launch its allegedly infringing Candid Studios platform, which further tilts the balance of hardships towards SDC and away from Candid.

48.   As an initial matter, SDC's economic harm absent injunctive relief would be substantial for the reasons discussed above and throughout this declaration, including: (1) loss of sales and market share, (2) potential price erosion, (3) reputational harm and loss of goodwill, (4) harm due to confusion in the marketplace, and (5) disruption of SDC's referral networks and ancillary sales opportunities. Furthermore, because SDC is at an early stage in its growth, the impact of Candid's alleged infringement on SDC's overall business planning and growth trajectory is magnified.  As discussed above, SDC requires a certain level of customer adoption and volume before it can fully recoup its fixed expenses, including its significant fixed expenses related to manufacturing its clear aligners in house.   However, because SDC incurred many of these fixed expenses with the expectation that it would enjoy exclusivity in commercializing the patented concepts, it may be more difficult to fully recoup these fixed expenses if Candid remains on the market with an infringing product than it otherwise would have been (particularly if Candid continues expanding "everywhere",[94] contributing to confusion in the marketplace, and misrepresenting its status as the innovator of SDC's patented business model, as discussed above).  Moreover, fully capturing and quantifying all of SDC's potential harm may not be possible, and, even if it were, Candid may not have the resources to pay a monetary damages award. As a result, SDC is likely to be significantly and irreparably harmed absent a preliminary injunction.

---

[94]      Candid, "The Candid Studio™ experience is here, and soon, it'll be everywhere," 6/4/2018, https://blog.candidco.com/candid-store-4ffe6ea6612d.

49.     To be sure, Candid may also face certain potential economic consequences if the infringing aspects of its Candid Studios platform were preliminarily enjoined and later allowed.  For instance, a preliminary injunction may reduce Candid's growth and lessen its ability to recoup certain fixed expenses associated with its Candid Studios platform.  However, whereas many of the aspects of harm to SDC would be irreparable for the reasons discussed above, the evidence suggests that Candid could mitigate aspects of the harm it may face in the event of a preliminary injunction.  First, Candid offers customers a fully-remote at-home dental impression kit, called a Candid Starter Kit, where the user takes photographs and dental impressions at home and may receive clear aligner therapy without visiting a Candid Studio.[95]  Candid's at-home dental impression kits would allow Candid to continue operating a significant portion of its teledentistry business if a preliminary injunction were entered.  Second, Candid may also have the ability to operate its Candid Studios in a non-infringing manner, so long as such an implementation does not practice the claimed elements of the '522 Patent (*e.g.,* the current in-person scanning implementation); as such, a preliminary injunction would not necessarily render Candid's investments in its physical Candid Studios locations unrecoverable (except for those specifically relating solely to the infringing aspects of the platform).  ███████████████████████████████████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████ █ ████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████

---

95      Candid, "Candid Starter Kit," https://www.candidco.com/products/starter-kit (accessed 9/10/2020).
96      Interview with Philip Harrison, 10/19/2020, SDC's Vice President of Strategy & Corporate Development.

50.    Finally, an additional factor that weighs in SDC's favor relates to evidence that Candid reasonably could have anticipated that SDC would seek patent protection over the inventions that subsequently issued as the '522 Patent at the time it opted to launch its allegedly infringing Candid Studios platform. ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████.[97]  Furthermore, at the time Candid launched its allegedly infringing Candid Studios, there was evidence that other companies in the clear aligner market had sought, obtained, and enforced their own patents against competitors,[98] and Candid reasonably could have anticipated the risk that SDC would do the same.  Indeed, at the time Candid launched its Candid Studios, SDC was in the process of seeking patent protection over the concepts now covered by the '522 Patent.[99] Thus, Candid reasonably could have anticipated the risk that SDC would seek to protect and enforce its intellectual property rights related to its industry-pioneering teledentistry business model and ultimately seek to exclude Candid from incorporating the infringing aspects of its Candid Studios platform (or any similar platform that practiced the patented inventions).  As such, Candid's decision to invest in the infringing aspects of its Candid Studios platform anyway was a calculated risk taken by Candid, and any harm experienced by Candid should a preliminary injunction be granted as a consequence of Candid's calculated risk-taking weighs against Candid in the balance of hardships.

---

[97]      Interview with Philip Harrison, 10/19/2020, SDC's Vice President of Strategy & Corporate Development.
[98]      Forbes, "Out Of Silicon Valley, A Billion-Dollar Orthodontics Business Built With Plastic And Patents," 4/25/2017, https://www.forbes.com/sites/michelatindera/2017/04/25/out-of-silicon-valley-a-billion-dollar-orthodontics-business-built-with-plastic-and-patents/#37090c8230c2.
[99]      *See* the '522 Patent.  The '522 Patent was filed on September 13, 2018, shortly after the launch of Candid Studios.  Moreover, the '522 Patent and its underlying application are a continuation-in-part of an earlier SDC patent application that was filed on October 5, 2017, before the launch of Candid Studios.

51.     Overall, based on the facts and circumstances described above, the balance of hardships appears to favor SDC.

## V. Public Interest

### A. Overview

52.     Finally, I understand that public interest is another factor considered by courts in evaluating whether injunctive relief is appropriate in the context of alleged patent infringement.[100]   I understand that, in pursuing a preliminary injunction, a plaintiff can demonstrate that the public interest would not be disserved by a preliminary injunction.[101]

53.     The public interest refers to analysis of the costs and benefits faced by society at large that would be affected by the injunctive relief being sought.  On one hand, a potential injunction relates to the preservation of SDC's patent rights and economic opportunity as an innovator during the preliminary injunction period.  On the other hand, Candid's product relates to providing additional choice and competition for direct-to-consumer clear aligner products during the preliminary injunction period.  These trade-offs are evaluated as follows.

### B. Analysis

54.     Evidence here indicates that the public interest would be served by a preliminary injunction.  Indeed, public policy regarding patent protection has been designed and legislated specifically to encourage innovation to the benefit of the American public.  As described in Article 1, section 8 of the U.S. Constitution:

---

[100]     *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006).
        *Apple, Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370 (Fed. Cir. 2012).
        *Altana Pharma AG and Wyeth v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceuticals Industries, Ltd.*, 566 F.3d 999 (Fed. Cir. 2009).
[101]     *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).
        *Apple, Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012).
        *Altana Pharma AG and Wyeth v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceuticals Industries, Ltd.*, 566 F.3d 999, 1005 (Fed. Cir. 2009).

"Congress shall have power… _to promote the progress of science and useful arts_, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries."[102]   In this case, several economic factors, including the limited patent life to date resulting in SDC having yet to earn a return on its investment, show the importance of protecting SDC's innovative invention, described as follows.

55.   **[1] The '522 Patent was recently issued**.  The '522 Patent at-issue in this case was issued on April 28, 2020.[103]  Thus, SDC has had the associated patent rights for less than half a year, during which time Candid's alleged infringement has occurred continuously.  United States law grants inventors patent rights for 20 years from the priority date of the invention (in this case, October 5, 2017).[104]  The '522 Patent's short period of issuance to date weighs in favor of protecting SDC's patent rights through the issuance of a preliminary injunction.

56.   **[2] The enabled system and market segment is new**.  In addition to the '522 Patent itself, the SmileShop process and, indeed, direct-to-consumer clear aligner treatment models themselves are in the early stages of development.  SDC was founded in 2014 and has been credited with revolutionizing the teledentistry industry.  SDC describes itself as _"the leading player in this **early but massive opportunity**."_[105]   In addition, J.P. Morgan market analysts described that _"[t]he global addressable market for malocclusion is significant, and with **less than 1% of SmileDirectClub's target market receiving care today**, there is a long, multi-year runway for global growth."_[106]   Furthermore, William Blair market analysts

---

[102]   USPTO website, General Information Concerning Patents, 10/2015, https://www.uspto.gov/patents-getting-started/general-information-concerning-patents.  Emphasis added.
[103]   The '522 Patent.
[104]   USPTO website, General Information Concerning Patents, 10/2015, https://www.uspto.gov/patents-getting-started/general-information-concerning-patents.
      The '522 Patent.
[105]   SmileDirectClub, Inc., Form 10-K, 2019, at 2. Emphasis added.
[106]   J.P.Morgan, "There's a Lot to Smile About; Initiating at OW, $31 PT," 10/7/2019, at 1.

described SDC as "the pioneer in the direct-to-consumer clear aligner space."[107]  As another example, an online biotechnology magazine described SDC as an "…industry pioneer and first direct-to-consumer medtech platform for teeth straightening."[108]  Despite its status as the leading innovator in the teledentistry market, SDC has not yet been able to enjoy a significant period of exclusivity over the economic opportunity that has been enabled by the '522 Patent.

57.     **[3] SDC is entitled to an opportunity to earn a return on its innovation**.  As mentioned above, a fundamental reason for patent protection is to "promote the progress of science and useful arts."[109]  An important element of patent protection is to offer the innovator of the patented technology the opportunity to earn a return on its innovation.  The Federal Circuit has emphasized the importance of this element, citing literature on the subject: *"The patent laws promote the progress in different ways, prominent among which are by protecting the investment of capital in the development and working of a new invention from ruinous competition till the investment becomes remunerative."*[110]  The Federal Circuit has further upheld at least one district court's grant of a preliminary injunction based on similar considerations, having noted that: *"The district court appreciated that the public interest includes consideration of whether, by shifting market benefits to the infringer while litigation is pending for patents that are likely to withstand the attack, the incentive for discovery and development of new products is adversely affected. The statutory period of exclusivity reflects the congressional balance of interests,*

---

[107]     William Blair, "A Direct-to-Consumer Clear Aligner Provider; Time to Join the Club? Initiating Coverage With Outperform Rating," 10/7/2019, at 13.
[108]     BioSpectrum, "Smile Direct Club brings affordable dental solutions to NZ," 10/10/2019, https://www.biospectrumasia.com/news/53/14657/smile-direct-club-brings-affordable-dental-solutions-to-nz.html.
[109]     USPTO website, General Information Concerning Patents, 10/2015, https://www.uspto.gov/patents-getting-started/general-information-concerning-patents.
          *See also*, *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F. 3d 1538, at 1547.
[110]     *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F. 3d 1538, at 1546, citing Simonds, *Summary of the Law of Patents* 9 (1883).

*and warrants weight in considering the public interest*."[111]   In this case, SDC has not yet had the chance to earn a return on its innovation, as is evident in its net losses from 2017 to 2019.  See Attachment B-1.  Meanwhile, Candid's infringing Candid Studios platform has already been commercialized in direct competition with SDC's offerings, as discussed above.  Indeed, I understand that Candid has infringed the '522 Patent continuously since it was issued in April 2020 aside from a brief period in time during the COVID-19 pandemic.  In other words, SDC has yet to enjoy any deserved market exclusivity conferred by its patent.  Thus, this factor weighs towards protecting the patent rights in this case via a preliminary injunction.

58.     On the other hand, evidence demonstrates that customers would not be substantially harmed in the event of a preliminary injunction in this case:

59.     **[1] SDC would be able to service potential Candid customers**.  Even if Candid's infringing product were off the market, most, if not all, Candid customers and potential Candid customers would still have access to SDC's products and services.  ███████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████

---

[111]     *Abbott Laboratories v. Sandoz, Inc.,* 544 F.3d 1341 (Fed. Cir. 2008).



60.     Furthermore, as noted throughout this declaration, SDC's SmileShops offer a similar customer experience as Candid Studios, and thus are likely to be acceptable substitutes to prospective Candid Studios customers.   SDC has the marketing capacity and size to reach prospective Candid Studios customers for the reasons noted in Section III.B above (*e.g.,* Candid markets to the same target demographic as SDC).   Thus, even if Candid Studios were to cease operations entirely following a preliminary injunction, SDC would have the capacity to serve those customers.  In contrast, if Candid continues to expand its allegedly infringing Candid Studios operations absent a preliminary injunction, a greater number of

customers would likely be impacted mid-treatment should a final judgment on the merits determine that SDC is entitled to permanent injunctive relief.

61.      **[2] There are alternative orthodontic treatments available**.  Even if a prospective Candid Studios customer elected not to choose an SDC offering if a preliminary injunction were granted in this case, that customer would still be able to choose from several alternative options for both clear aligners and traditional orthodontic treatments.  As discussed above, SDC has acknowledged a degree of competition with other entities in the "direct-to-consumer clear aligner industry" and "more well-established competitors in the traditional orthodontic industry," including Candid's own fully remote at-home kits, Smilelove, SnapCorrect, byte, and Align.[112]   These alternative orthodontic treatments would be available to prospective Candid Studios customers in addition to SDC's offerings in the event of a preliminary injunction.

62.      **[3] SDC has incentives to maintain reasonable prices**.   A fundamental aspect of SDC's business is to offer a lower priced alternative to traditional orthodontics and competing clear aligner treatment options like Invisalign.  As stated to investors and the SEC, SDC describes its business as offering "professional-level service and high-quality clear aligners at a cost of $1,895, up to 60% less than traditional orthodontic solutions."[113]

---

[112]      SmileDirectClub, Inc., Form S-1, 2019, at 27.
[113]      SmileDirectClub, Inc., Form 10-K, 2019, at 2.
         As noted above, SDC was initially priced at $1,895 but was raised to $1,950 in c. 2020.
         *See*, SDC, "Smile Direct Club Kicks off Second Annual Gift of Grin Contest," 10/7/2019, https://investors.smiledirectclub.com/news-releases/news-release-details/smile-direct-club-kicks-second-annual-gift-grin-contest.
         SmileDirectClub, "Pricing for everyone," https://smiledirectclub.com/pricing/ (accessed 9/10/2020).

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████ [114]  As a result, the public is already benefitting from SDC's innovations and business model through lower pricing compared to traditional and alternative orthodontic treatment options. Because SDC's business strategy is focused largely on this price advantage, SDC has strong incentives to continue offering reasonable and competitive prices should a preliminary injunction be issued in this case.  Moreover, as noted above, Candid's prices have generally exceeded SDC's prices.  As such, if SDC were to maintain its existing pricing in the event of a preliminary injunction, prospective Candid Studios customers that accrued to SDC would likely enjoy *lower* overall prices. With that said, Candid's historical price increases (which exceed SDC's own historical price increases)[115] suggest that SDC *could* further raise its prices to some degree, yet SDC's prices would not be expected to increase unreasonably or in a way that harms customers or competition for the reasons discussed above.  Thus, the public is unlikely to experience unreasonable price increases if a preliminary injunction were issued and is also likely to continue enjoying the benefit of low prices compared to traditional orthodontics pioneered by SDC.

63.    Based on all of the facts and information described herein, I find that the public interest in this case favors granting SDC injunctive relief.

## VI.    Conclusion

64.    In summary, based on all the facts and information described herein, I find that, from an economic perspective: (1) SDC has suffered and will continue to

---

[114]    Interview with Philip Harrison, 10/19/2020, SDC's Vice President of Strategy & Corporate Development.
[115]    For example, Candid and SDC historically charged standard prices of $1,900 and $1,895 for clear aligner treatment (without financing).  Candid subsequently increased its price by $500 to $2,400; during the same time, SDC increased its price by only $55 to $1,950.
       See Table 1 above and Attachment B-4.

suffer irreparable harm as a result of Candid's alleged infringement of the '522 Patent, and available monetary remedies may be inadequate to compensate SDC for such harm (Section III); (2) the balance of hardships favors granting SDC injunctive relief (Section IV); and (3) the public interest favors granting SDC injunctive relief (Section V).

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.  Executed this 26th day of October 2020 in Chapel Hill, North Carolina.

_____
DeForest McDuff, Ph.D.